# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| Bryan Olson | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 16 CV 50391 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting Commissioner of Social Security,[1] | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability appeal. Plaintiff Bryan Olson, who is 33 years old, claims that he is disabled because of back pain. He had back surgery in 2008, and tried to return to work, and then had surgery again in 2009, but the pain persisted. He then stopped working altogether. Although he is now represented by counsel in this appeal, he proceeded *pro se* at the two administrative hearings. This was not his preferred approach as he told the administrative law judge ("ALJ") at each hearing that he was in the process of getting an attorney. One of his arguments here is that the ALJ unreasonably refused to grant him a continuance at the second hearing, so that he could get an attorney, and then compounded that error by failing to develop the record.

## BACKGROUND

The first hearing was held on February 10, 2015. The ALJ began by telling plaintiff that he had the right to an attorney who would only be paid out of any back benefits recovered and that those fees would be capped. The ALJ asked if plaintiff wanted to go forward without an attorney, and plaintiff responded "[n]ot really," stating that he was having a "hard time" finding

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

an attorney. R. 53. The ALJ then began discussing some of the evidence. Eventually, the ALJ expressed her opinion that plaintiff was unlikely to prevail *even if* the case were continued and he got a lawyer.[2] To support this claim, the ALJ noted, among other things, that there was a three to four year gap in treatment and that two consultative examiners "both said you're not disabled." R. 56. Plaintiff stated several times that he did not get treatment because he had no insurance.[3] Despite the ALJ's doubts about plaintiff's claim and her belief that it was essentially futile for plaintiff to seek a lawyer, the ALJ granted plaintiff a continuance to find a lawyer. However, the ALJ made it clear, abundantly so, that there would be only one continuance granted.[4] The ALJ also stated that she was "going to have [plaintiff] sign the form that says [he was] going to get one continuance and one continuance only." R. 63. This form was presumably a waiver of counsel form, likely similar to the one plaintiff signed at the next hearing.[5]

The second hearing was held three months later. Plaintiff again appeared without an attorney. He stated that he had contacted a lawyer, but that the lawyer wanted to first see certain records before deciding whether to take the case. The ALJ basically cut plaintiff off and reminded him that she had told him that the previous continuance was a "one-time deal." R. 26. The ALJ then instructed plaintiff to sign a form stating that "you've been advised of your rights,

---

[2] R 58 (telling plaintiff that any attorney he hires is "going to see exactly what I see, which is—there's no evidence here that says you're disabled"). The ALJ reiterated her opinion several more times throughout this hearing. *See* R. 60 ("And basically, any lawyer you talk to is going to tell you what [] I'm telling you, which is, there's no evidence."); R. 61-62 ("Well, I've got to tell you, based on this record, there's not a lot I can do; but I will give you one opportunity to go talk to a lawyer, [] who, when they look at your file, are going to tell you the exact same thing. So no lawyer's going to take your case."). Toward the end of the hearing the ALJ stated the following, which is perhaps less dogmatic about the futility of getting a lawyer: "You know, maybe some lawyer will have an opportunity to [] be able to figure out how to help you with this. But based on what I'm seeing, I don't have . . . ." R. 63. The ALJ did not finish the latter sentence as plaintiff began talking. So it is not even clear that the ALJ was softening her stance.
[3] *See* R. 55 (stating that he "can't afford" medications and that his doctor "charges [him] about $1,000 to $2,000" every single visit); R. 59 (stating that he "lost [his] insurance").
[4] *See* R. 57 ("I am going to give you one continuance. I'm going to give you exactly one continuance."); *id.* ("But the next time that we have a hearing, I won't give you another continuance."); *id.* ("We will have a hearing. It's a one-time deal.").
[5] The Court could not find a copy of this form in the record.

and you are going forward today without representation." *Id.* Plaintiff appeared to object, asking whether he could get another continuance and stating that he "had a hard time" trying to get an attorney, but the ALJ did not ask further questions. Instead, the ALJ instructed her assistant to give plaintiff the form to sign. When the assistant read the form to plaintiff, telling him that he was agreeing "to proceed today without a lawyer," the ALJ interrupted to say that plaintiff "doesn't get a choice" because he "was given that choice once before." R. 27.

The hearing then proceeded with the ALJ describing the exhibits in the record and noting that plaintiff brought in updated records from Mercy. The ALJ also noted that plaintiff received Medicaid insurance in February and that he had then "immediately" gone to the doctor. Plaintiff stated that he had an x-ray taken of his back, but the ALJ stated that she "can't read a disk" and asked whether there was any analysis of the x-ray. R. 32. Plaintiff also noted that he had been referred to a urologist for incontinence problems he had over the last three years, and also noted that his doctor recently diagnosed him with hypertension and diabetes.

After this discussion, the ALJ then began what seems to be, to this Court at least, a somewhat unusual analysis of the problems presented by the way plaintiff chose to litigate his disability claim. The ALJ noted that plaintiff had filed several earlier disability applications, but had not chosen to appeal them. The ALJ further explained that, because plaintiff was only proceeding under Title II, he would have to establish that he was disabled by the end of 2013 (the last onset date). The ALJ observed that plaintiff in his current disability application did not apply for SSI benefits under Title XVI "for some reason," even though he "might be eligible" for such benefits, and then stated that "this is not fair, because you did file for SSI benefits the last time you filed." R. 35. The ALJ questioned why Administration personnel "didn't take an [] SSI claim" when plaintiff appeared before them. R. 36. There was then a brief discussion about the

3

fact that plaintiff originally had a worker's compensation case pending case, which led to some treatment for his back problems. But after that treatment, plaintiff received no treatment for three to four years. The ALJ told plaintiff that he "did the wrong thing" in the way he filed prior applications, and noted that he had been trying to qualify as disabled since January 2009. R. 38.

The ALJ eventually announced that there were two avenues to address these problems. One was that the ALJ could "issue a decision denying [plaintiff] benefits," and then he could "get a lawyer and appeal it." R. 42. The other option was that plaintiff could choose to "walk away and refile the SSI and try and get that." *Id.* But then the ALJ made the choice for plaintiff, stating, "I think, you're better served, at this point, for me to deny it, and you get a lawyer, who can help you[.]" R. 42-43. She stated that she could "hold out for the current x-ray and everything" but it would not help "because of those four years of nothing" (meaning the period without treatment). R. 44. The ALJ then told plaintiff that, after he received her decision denying his claim, that he should "immediately" take the following steps: "I recommend you talk to an attorney about it. I also recommend that you file an SSI application immediately. And when you talk to the attorney, tell them that you did that." R. 44-45.

On July 24, 2015, the ALJ issued her decision finding plaintiff not disabled. The ALJ found that plaintiff had the severe impairments of degenerative disc disease and obesity. However, the ALJ found that plaintiff had the residual functional capacity to perform light work. The ALJ's two main rationales were that plaintiff had a large treatment gap and that the consultative examiner made several normal findings during the exam.

## DISCUSSION

Plaintiff raises a series of arguments attacking the merits of the ALJ's decision. But his last argument is the procedural argument described above. This argument logically should be

4

addressed first because it potentially infects the others. The overarching question is whether plaintiff validly waived his right to counsel, but the parties discuss this question in terms of several specific issues. The first is whether the ALJ unreasonably refused to grant a second continuance. The second is whether the ALJ fully explained all the ways an attorney could help plaintiff present his case. The third is whether the ALJ fully developed the record at the second administrative hearing. Although the first two arguments raise several valid concerns, the Court finds that the third argument presents the clearest case for remand.

On the question of whether the ALJ should have granted a second continuance, each side formulates the issue in slightly different terms, and neither side has cited to any clear-cut authority to answer the question. The Court agrees with plaintiff that he did *not* voluntarily agree, at the second hearing, to proceed without counsel. It is true that he did not explicitly ask for a continuance, but the context strongly suggests he wanted one. However, the ALJ made clear he could not get one. For this reason, the ALJ's decision to *force* plaintiff to sign a form stating that he was *voluntarily* going forward without counsel is an odd and potentially confusing exercise, especially for a *pro se* litigant.

However, this fact does not mean that the ALJ's decision to deny a continuance was unsupported. The better justification is that the ALJ gave plaintiff a reasonable chance to obtain counsel by giving him the continuance at the first hearing. Plaintiff then had over three months before the second hearing to obtain counsel, and then he returned with the same general explanation—namely, that he was talking to attorneys who wanted more records. Plaintiff appears to agree that the ALJ had the discretion to deny a second continuance if she had a "good reason" to do so, but argues that she did not. But plaintiff overlooks the general concern that any ALJ might have in managing a busy docket and the corresponding need to set reasonable (and

5

final) rules, even for *pro se* litigants. Plaintiff has not cited to any authority *requiring* an ALJ to grant a continuance under these circumstances. The Court is concerned that, if accepted, plaintiff's argument would be tantamount to imposing a strict, two-continuance minimum.[6]

Turning next to plaintiff's second argument—that the ALJ failed to fully explain the benefits of counsel—the Court again finds that there are competing arguments. The Government notes that plaintiff was given written notices, before both hearings, explaining his right to counsel, and that the ALJ also discussed some of these rights at both hearings. Although true, the Government's argument overlooks the real problem, which is that the ALJ made a number of statements that could be construed as undermining these rights. Most notably, as described above, the ALJ repeatedly told plaintiff point-blank at the first hearing that getting a lawyer would not change the result.[7] Then at the second hearing, the ALJ gave plaintiff legal advice about filing claims and, ironically, told him to "immediately" get a lawyer after she denied his claim. This exchange was confusing to this Court, and this Court suspects it was even more confusing to plaintiff who is not a lawyer.[8] Still, despite all these issues, one could argue that plaintiff was, in fact, not discouraged in his efforts to get a counsel after the first hearing because he appeared at the second hearing and told the ALJ that he had been actively, albeit unsuccessfully, working on obtaining counsel.

---

[6] And then the ALJ could face the next question—if you've had two, why not three or four? *Cf. Cada v. Baxter Healthcare Corp.*, 920 F.3d 446, 452-53 (7th Cir. 1991) ("Statutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy, and repose."). Of course, a particular judge might draw the line at a different point, but there still likely would be some line-drawing moment in the number of continuances given.

[7] In *Johnson v. Astrue*, 326 Fed. Appx. 737 (5th Cir. 2009), the Fifth Circuit faced a similar argument and remanded because the ALJ's comments "effectively discourag[ed]" the plaintiff from pursuing legal representation by telling him, among other things, that "the best lawyer in Louisiana can't take a bad case and make a good one" and "the worst lawyer in Louisiana can't take a good case and make a bad one." *Id.* at 739. The Fifth Circuit held that these oral statements effectively trumped the written pre-hearing disclosures.

[8] The ALJ may well have been sincerely trying to help plaintiff with this advice, but the net result, in this Court's opinion, was confusing.

This leads to the third part of the argument. Even if the ALJ's actions were proper with respect to the first two arguments, and those conclusions could be debated, the Court finds that the ALJ's failure to adequately develop the record at the second hearing is a firm basis upon which to remand this case. In every case, an ALJ has a duty to develop a full and fair record. However, this duty is more exacting where the claimant is proceeding *pro se*. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). This "enhanced" duty requires the ALJ to "scrupulously and conscientiously" explore the relevant facts, and "to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information." *Id.* An ALJ's failure to fulfill this "special duty" is a good reason to remand to allow additional evidence to be developed. *Thompson v. Sullivan*, 933 F.2d 581, 586 (7th Cir. 1991). In *Thompson*, the Seventh Circuit noted that it was important for the ALJ to elicit both favorable and unfavorable facts. *Id.* at 587.

After reviewing the transcript of the second hearing, the Court finds that the ALJ did not "scrupulously and conscientiously" explore the relevant issues. As described above, the bulk of the hearing was devoted to the ALJ's analysis of why it would be better for plaintiff to have his claim denied so that he could then promptly file an appeal.[9] In other words, it appears to the Court that the ALJ did not even *attempt* to engage in the type of questioning that the Court typically sees in these cases. It is true that the ALJ touched upon a few medical issues during the hearings, but these exchanges were brief and were entangled in the larger debates about whether plaintiff had obtained a lawyer and whether he had litigated his claim in the best manner. Critically, it is undisputed, even by the Government, that the ALJ failed to inquire at all about several customary topics. For example, the ALJ did not ask plaintiff about his daily activities

---

[9] Strangely, plaintiff took the precise actions the ALJ suggested, but the government is now arguing in support of affirmance that this action was erroneous.

nor ask him to describe a typical day. The ALJ did not probe into plaintiff's lack of treatment, even though plaintiff repeatedly explained that his lack of insurance prevented him from getting treatment. The ALJ did not attempt to elicit favorable information. The ALJ likewise asked no open-ended questions. To the contrary, the ALJ made clear, from the beginning of the first hearing, that she had already concluded that plaintiff had no chance of prevailing.

At the end of the Government's brief, after acknowledging that the ALJ failed to inquire into several relevant topics, the Government asserts that plaintiff has failed to show how the ALJ's failures prejudiced him. The Government is essentially arguing that any errors in failing to further develop the record were harmless. Although the Court acknowledges that there are legitimate questions about whether plaintiff ultimately will qualify as disabled, the Court is not convinced at this point that there was no prejudice, in part because plaintiff has not had the benefit of counsel who might bring out stronger arguments or call additional witnesses. Moreover, the Court finds that the ALJ's decision can be criticized in several respects. Plaintiff raises several arguments in his briefs, but the Court here will only discuss two.

First, as noted above, one of the ALJ's central rationales was the lack of treatment for three to four years after plaintiff's second back surgery. However, the ALJ did not seriously consider that plaintiff claimed that he lacked insurance and could not otherwise get treatment. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"). Although the ALJ acknowledged this explanation several times, the ALJ then mostly disregarded it. The only specific counter-argument raised by the ALJ—that plaintiff could have paid for some of his medical treatment if he gave up smoking—is questionable as a factual matter because the ALJ did not inquire into the issue. *See Eskew v.*

8

*Astrue*, 462 F3d. Appx. 613, 616 (7th Cir. 2011) ("[The ALJ] summarily dismissed Eskew's explanation for not taking prescribed medication simply by noting her ability to buy cigarettes during that time—even though the record contains no information about either the price of her medication or the cost of her cigarette habit.").

Second, as another key rationale, the ALJ concluded that certain medical findings taken from a 25-minute consultative examination (*e.g.* that plaintiff "retains full strength, muscle tone and muscle mass") justified the conclusion that plaintiff's alleged back pain would not prevent him from being able to "stand or walk for *prolonged* periods." R. 15 (emphasis added). However, because the ALJ did not call any medical expert at either hearing and because no other doctor offered a similar analysis, the ALJ was, therefore, engaging in a layperson analysis of the medical findings. This is another reason for a remand. *See Lewis v. Colvin*, No. 14 CV 50195, 2016 U.S. Dist. LEXIS 115969, *11 n. 3 (N.D. Ill. Aug. 30, 2016) (courts, counsel, and ALJs must resist the temptation to play doctor).

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: March 19, 2018                      By: _____
                                                                Iain D. Johnston
                                                                United States Magistrate Judge